NATHANIEL B. VOTER, Respondent, v. GEORGE A. NEWSALT, and F. L. King. GEORGE A. NEWSALT, Appellant.

(225 N. W. 74.)

Opinion filed April 1, 1929.   Rehearing denied May 3, 1929.

*A. C. Lacy,* for appellant.
*Weston, LaBree & Shafer* and *T. D. Pierce,* for respondent.

BURR, J.   This is an action for damages arising out of alleged malpractice.

The complaint sets forth a cause of action against both defendants. No service was had on the defendant King.   The defendant George A. Newsalt answered setting up a complete defense.   After both parties rested the defendant moved the court for a directed verdict, which motion was overruled, and the case submitted to a jury who returned a verdict in favor of the plaintiff and against the defendant.   The defendant appeals.

There are over sixty specifications of error, some of which have four or five sub-divisions.   Forty of these specifications deal with the reception or rejection of evidence, sixteen with the charge to the jury and the remainder with the refusal to direct a verdict and to remarks made by the court and opposing counsel.

The main issue in the case is the connection between the defendant Newsalt and one Dr. King.   There is no dispute but what Dr. King performed an operation upon the plaintiff in defendant's office and there is ample evidence to show that the operation performed was done carelessly and negligently so that infection set in and plaintiff suffered loss and damage.   There is no issue taken as to the amount of damages

recovered; but the defendant Newsalt strenuously contends he had no connection with the operation, that it was not performed by him nor did he assist in it; that the plaintiff was not his patient and he was in no way responsible for the condition which developed.

The evidence shows the plaintiff had a hernia of some years' standing, and learning that Dr. King of Omaha, Nebraska, claimed to cure hernia without an operation he entered into correspondence with him. In the letters known as exhibits 1 to 4, inclusive, and "A," "B" and "C"—exhibits offered by the plaintiff and re-offered by the defendant himself—we find Dr. King telling the plaintiff: "Dr. G. A. Newsalt of Fargo knows more of the success of my work than any other doctor in N. D. I have treated 20 cases for him in the past ten years. . . . Write Dr. Newsalt and ask about it." Plaintiff wrote to Dr. Newsalt and got some reply from him indicating at what time Dr. King would be in Fargo at Dr. Newsalt's office and wrote King, saying: "Dr. Newsalt said you were going to Aberdeen before long. Please let me hear from you soon." In another letter Dr. King says: "Now if you can arrange to come to Dr. Newsalt's in Fargo 5th or 6th of March, I will let you know the exact date to be there later." The plaintiff writes: "I take it from your letter that you do your work at Dr. Newsalt's office. Please give full information in your next reply." And Dr. King replies: "Be in Fargo at Dr. Newsalt's office Sunday A. M. 6th. I think I will get there in A. M. The doctor will tell you."

Accordingly plaintiff went to Fargo on March 5th, 1927. The next morning he went to Dr. Newsalt's office, and found the defendant there with Dr. King and a stranger. When he entered Dr. Newsalt said: "Here is our man," and Dr. King commenced to examine him. Plaintiff says that Dr. Newsalt assisted in the operation and "if I remember right, he sterilized the instruments and held the light while Dr. King was performing the operation." Again he says: "I am not sure whether Dr. Newsalt handled those instruments or not but I think he did." His testimony summarized is that Dr. Newsalt was present in the operating room most of the time, held the light for Dr. King, assisted in other ways and at times attended to other patients. Defendant asked Dr. King how he was getting on. The operation was performed by inserting a needle through the wall of the abdomen in an

attempt to reach the hernia and sew the parts together. When the operation was performed and the plaintiff had paid Dr. King, Dr. King gave defendant instructions what to do. He told him to take the plaintiff down to the Dacotah Hotel and if any swelling or infection appeared to get some witch hazel and apply it and keep the parts bathed with a solution of epsom salts. Dr. Newsalt assisted plaintiff to a hotel, about one P. M. took him to a room and told the proprietor to look after him and to take up his meals to him. That evening Dr. Newsalt called on him, lifted up the sponge and examined the wound; the next morning he called again, asked him how he was getting on and told him if he was not improving he would get some witch hazel. The defendant came again that evening and on the next day inquiring about his condition saying he had not much time then but would call again. That evening he came, got the witch hazel, and bathed the wound. In the forenoon of Wednesday he again bathed the wound with witch hazel, gave him a chiropractic treatment along the spinal column and made an adjustment about the middle of the back, taking about twenty minutes in the operation. Coming again that evening he brought a bottle of malt for plaintiff, and on Thursday morning, called to inquire about his condition. Plaintiff says he never sent for the defendant at any of these times but nevertheless that defendant called.

Defendant says he had been acquainted with Dr. King for ten to fifteen years, that Dr. King had performed work for him before but he did not know how many times and at the time of plaintiff's operation defendant had a patient in the office to whom Dr. King operated immediately after he was through with plaintiff. He said Dr. King would come to his office whenever he told him there were cases to work on; that such work was done on persons who were his own patients, but being a chiropractor he did not operate himself and he would get in touch with Dr. King and arrange for him to come and treat them. These patients were treated in his office but he got no portion of the fees for the treatment that Dr. King gave. He said Dr. King gave him $10 for the use of the office in the plaintiff's case, but nothing for the operation. He admits calling on the plaintiff at the Decotoh Hotel as alleged by the plaintiff but denies giving him chiropractic treatment or that he did anything for him except to get him such things as he asked for such as witch hazel, etc., and denies ever prescribing for the

158

plaintiff or attending him in a professional capacity. He says that after the plaintiff complained of swelling·· and pain he got into communication with King and wired him.

The testimony of Dr. King, a witness for the defendant, shows he is not admitted to practice in this state, but that "he had been specializing in the treatment of hernia for some ten or fifteen years." He says he paid the defendant something for taking care of the case but he is not sure how much, possibly $20; that he expected Dr. Newsalt ·to· take care of the case and that a few days after the operation he received a letter and telegram from the defendant relative to plaintiff's condition.

It is the contention of the defendant that even assuming all that the plaintiff says to be true he is not connected with the operation in such a manner as to charge him with any of the effects, and that in the further light of his version it is clear he is not liable.

In giving this statement of the evidence we do not attempt to set forth a complete synopsis but have indicated enough to show the issue involved. Both defendant and Dr. King deny that Dr. Newsalt had anything to do with the operation and we do not set forth defendant's case in the entirety, but his connection with the case was a matter for the jury to determine from all of the evidence introduced. We are of the opinion that there is sufficient evidence connecting Dr. Newsalt with the operation to justify submitting the case to the jury, and this disposes of all the alleged errors based on the insufficiency of the evidence.

The forty specifications of error based upon the exclusion or reception of evidence come from the assumption that the defendant was not connected with the case. For instance, the plaintiff in stating why he went to Dr. Newsalt's office the morning after he reached Fargo stated that when he went into the hotel "the girl at the telephone office said 'Dr. Newsalt is calling you to the office,' " and he went over there. It was alleged this is hearsay. When first offered it was stricken out but later in the case the plaintiff made a similar statement which was allowed to stand. It merely explained why he left the hotel at that time. It is true Dr. Newsalt denies calling him over the phone but the defendant does not dispute he wrote plaintiff telling him when Dr. King would be at his office, that plaintiff came to the office, and that he himself

was present when the plaintiff came there. If there was error it was without prejudice. The court required the defendant to answer a question referring to Dr. King to the effect, "Do you usually work together in these cases?" The examiner was referring to the times when Dr. King performed operations in defendant's office. The defendant admits he had Dr. King come and operate on some of his patients. There were several other objections along the same line but there was no error in the rulings as it was necessary to establish a relationship between Dr. King and the defendant. If it were the usual practice of the defendant to assist in the operations which were performed in his office, and a working arrangement between them for securing patients could be shown, it would enlighten the jury as to the relationship between the two men and might have some bearing upon whether the defendant was connected professionally with this operation in the endeavor to show that this was simply one of a series. It is true that the contract with the defendant was distinct from any contract made with previous patients but the plaintiff had the right to show the relationship existing between the two doctors. The evidence fails to show that King was in the office of the defendant at any time other than the times he was performing operations for defendant or defendant's patients, even on this day, for defendant admits he had a patient of his own—one Northrup—waiting for Dr. King to operate. We have examined the other rulings with regard to the reception or rejection of evidence and find no error therein.

Specification of error 41 deals with certain remarks of the court in ruling upon objections to an offer of proof. The defendant offered to prove by this witness Northrup that immediately after the operation on the plaintiff Dr. King commenced an operation of the same nature, upon him, treated him in the same manner, sent him to a hotel and that no ill effects followed. Plaintiff objected upon various grounds, and the court in sustaining the objections said that while he sustained the objection he did not do this "upon all the grounds stated in the objection but the fact this was successful in another person and that person being on the stand to testify and not being an expert or a physician or a man skilled in that business but being a mere layman so far as treatment and operation for hernia is concerned, the evidence could not be admitted." This was correct. The court further remarked he

took judicial notice of the size and eminence and superior qualities of the large medical staff of active practitioners in the city of Fargo and that he would admit testimony of any of these. There was no error in this friendly suggestion of sources of help even though unsolicited, and recognizing the merits of the home products does not necessarily mean disparagement of the other. Neither can there be said to be a subtle throwing of the prestige of these surgeons against the defendant.

Specification 42 is levelled at the failure to strike out certain testimony. This was testimony given by the plaintiff regarding certain conversation and transactions had with the defendant over this matter. The reason given for the motion to strike out is that there is no allegation in the complaint of any want of attention or improper attention after the so-called operation and upon further ground that there is no evidence in the record to show that the defendant Newsalt was employed by the plaintiff in any capacity whatever. There was no error in denying this motion.

Specification 43 deals with the remarks of the plaintiff's counsel in his address to the jury. It seems counsel in his argument said: "Here is Dr. King, Dr. Newsalt's partner." The objection is "there being no evidence in the record to show that Dr. King was a partner of Dr. Newsalt and said remarks are prejudicial." If there was any prejudice in this remark it was immediately cured as the court sustained the objection, and said it should not have been made, and cautioned the jury to disregard it, telling the jury it was for them to determine the relationship between the defendant and Dr. King.

In specifications of error 44 and 45 defendant complains that the court read the pleadings to the jury. There is division of authority on this point. On one hand some cases hold such reading is permissible. In Baltzer v. Chicago, M. & N. R. Co. 89 Wis. 257, 60 N. W. 716, it is said: "The court may read the pleadings so that the jury may know the real issues." In Earl v. San Francisco Bridge Co. 31 Cal. App. 339, 160 Pac. 570, it is said: "It is not error for the court to state plaintiff's claim in the language of the complaint instead of using equivalent phraseology." And in the body of the opinion, it is stated: "It was certainly proper to inform the jury as to the issues, and it is a mere question of rhetoric whether for this purpose the language of the pleadings or equivalent phraseology should be used."

However, as said by this court in the case of Black v. Smith, ante, 109, 224 N. W. 915: "The practice of reading pleadings to the jury is generally condemned. Pleadings are addressed to the court and not to the jury. Their primary function is to enlighten the court upon the issues involved in litigation. They may be couched in technical language not suited to convey a clear meaning to the lay mind, or they may contain allegations of such ultimate or evidentiary facts as the pleader hopes to establish, and the language may be pregnant with sinister implications beyond the power of a mere denial to eradicate." This view is sustained by the great weight of authority. As stated in Shebeck v. National Cracker Co. 120 Iowa, 414, 94 N. W. 930: "The danger of confusing the jury by stating to them substantially the entire pleadings . . . instead of stating the issues in an abbreviated form is to be discouraged and avoided." See also Home Sav. Bank v. Stewart, 78 Neb. 624, 110 N. W. 947; Texas & N. O. R. Co. v. Mortensen, 27 Tex. Civ. App. 106, 66 S. W. 99. As stated in 1 Blashfield's Instructions to Juries, 209: "Although there are decisions to the contrary the practice of reading the pleadings to the jury as part of the instructions is usually disapproved, but such practice is also usually considered harmless error."

But, though the practice of reading the pleadings is generally condemned it is not necessarily reversible error, being considered a matter of discretion. There are cases where the court permitted the jury to take the pleadings with them but the case was not reversed therefor, though the court said: "The practice is of doubtful propriety, and the pleadings should not be given to the jury unless in a particular instance there is some special reason for so doing." Mattson v. Minnesota & N. W. R. Co. 98 Minn. 296, 108 N. W. 517, and this decision was approved and adopted by the same court in Korby v. Chesser, 98 Minn. 509, 108 N. W. 520 and Savino v. Griffin Wheel Co. 118 Minn. 290, 136 N. W. 876. To the same effect is Powley v. Swensen, 146 Cal. 471, 80 Pac. 722; Myer v. Moon, 45 Kan. 580, 26 Pac. 40; Faircloth v. Isler, 75 N. C. 551; and Bluedorn v. Missouri P. R. Co. 121 Mo. 258, 24 S. W. 57, 25 S. W. 943, where it is said to be discretionary with the trial court.

In Evansville Gas & E. L. Co. v. Robertson, 55 Ind. App. 353, 100 N. E. 692, it is said: "While the practice of copying a complaint in-

cluding the caption and signature of counsel, in an instruction should not be encouraged, we are not able to say that appellant was harmed thereby in this case."

In this case the fault occurred, doubtless, because the court did not prepare a written charge. Where the court gives the pleadings to the jury and leaves it to the jury to ascertain the issues involved it is considered reversible error. In Kansas City, Ft. S. & M. R. Co. v. Dalton, 66 Kan. 799, 72 Pac. 209 and East Tennessee, V. & G. R. Co. v. Lee, 90 Tenn. 570, 18 S. W. 268, where the judgments were reversed because of the relation of the pleadings to the charge, the court had given the pleadings to the jury to read. In Baltimore & O. R. Co. v. Lockwood, 72 Ohio St. 586, 74 N. E. 1071, 18 Am. Neg. Rep. 590, the court read the pleadings and then left it to the jury to find the issues therefrom; except that in another and entirely separate paragraph the court remarked: "The issue in this case is negligence or want of ordinary care complained of on the part of the railroad and denied by the railroad company and alleging contributory negligence on the part of the plaintiff, which resulted in the accident."

The case was reversed for failure to state the issues, and other reasons. See also McLean v. Clark, 47 Ga. 24 and Barkley v. Tarrant Co. 53 Tex. 251. Had the court given a written charge and incorporated the pleadings therein, stating he was reading the complaint and the answer it might be equivalent to sending the pleadings into the jury. The practice of giving the pleadings to the jury to read especially without otherwise stating the issues, is generally condemned as erroneous; but to read them in an oral charge it can scarcely be said to have the same effect. In the case at bar the court, after reading the pleadings stated the issues involved, viz.: (1) Whether the operation was performed carelessly or negligently; (2) the connection the defendant had with it as an active participant therein; and (3) the amount of damages if findings favorable to the plaintiff were made on the first and the second propositions.

The complaint is largely taken up with the description of the operation and the subsequent proceedings. There is no real dispute as to the operation having been performed and as to the results thereof. The answer makes specific denials of any contractual relations with the defendant, any assistance given by the defendant in the operation and any

loss or damage suffered by the plaintiff. Had the court given a written charge it is quite likely the instructions would not have been so prolix and much that was given would have been omitted but we cannot say there is reversible error in the reading of the pleadings to the jury, although it should be avoided if possible.

Specifications 46 to 49 inclusive, deal with failure to give certain requested instructions as to burden of proof and the evidence required to show the connection between the defendant and this operation. The court gave the substance of these requested instructions as fully and fairly as was necessary and as required. So there was no error in giving this again.

Specifications of error 50 to 57 inclusive, are based, as appellant says in his brief, on the assumption of the court "that there was evidence tending to connect the defendant, Newsalt, with the defendant, King, in a joint undertaking in regard to the operation in question. We contend there was no evidence in the record to show that the defendant, Newsalt, was connected in any way with the operation performed by Dr. King on the plaintiff and no evidence to show Dr. Newsalt treated the plaintiff before, at the time, or after the operation."

Having already found there was sufficient evidence on the relationship between the defendant and Dr. King to charge the former as a defendant it is not necessary for us to deal further with these specifications of error.

Specifications 50 to 54, inclusive, are urged on the further ground that the court did not state the law properly. In the charge the court said that before the defendant could be held liable the jury would have to find "there was a business relation between the man King and the defendant Newsalt; in other words, if it were an operation with which both were connected and in which both were interested, whether directly, as a money consideration to the defendant Newsalt, or as a business benefit or in any other way, that was to the advantage or the credit of the man Newsalt, and the operation was performed in his office for that purpose, and he lent assistance for that purpose and that they had a business connection before, of a similar nature, and that this was carried on for the joint benefit, either directly as a money benefit, or for the benefit of business, or advertising, or otherwise." The court further said that the plaintiff had to show by the

164

greater weight of the testimony "that the defendant Newsalt was con-
nected with the operation, and had an interest in it, whether a direct
financial benefit or otherwise." Again the court said to the jury:
"Unless you find from the evidence that there was some understanding
and agreement between the defendant Newsalt and the man King, ei-
ther arrived at at the time or prior thereto, or from previous business
connections, that were continued under an understanding and agree-
ment with the man King, by the defendant Newsalt, then your verdict
should be for the defendant." Again the court said: "If you find
from the evidence that the defendant Newsalt did not have any interest
in the operation, was not concerned in any way with that, and if he
helped, if he did give any help or assistance to Doctor King, was a
voluntary matter and at the request of the man King, then for any
subsequent results for the acts of Doctor Newsalt, if there were any,
such as visiting the plaintiff, were either voluntarily done on his part
or were done as a favor to the man King, without Doctor Newsalt being
interested in the operation, then and in that case the defendant New-
salt would not be liable." It is probable that if the charge had been a
written charge the relationship would have been stated somewhat dif-
ferently, nevertheless the charge was favorable to the defendant and
covered the issues involved. The court charged that the burden of
proof was upon the plaintiff to establish the three issues hereinbefore
mentioned, namely, a negligent operation on the part of Dr. King, the
connection of the defendant with it in the manner and form stated in
the charge, and the amount of damages proved. It is true the court
charged that if they found the defendant was responsible for the results
of the operation "then he would be individually responsible without
respect to the matter of King not being an immediate defendant, be-
cause if he was concerned in it at all and liable as a party, each defend-
ant, or each of the parties thereto may be sued for all of the damages
resulting." There was no error in thus stating it.

It is not necessary to discuss the various specifications of error (58,
59, 59½ & 60) based upon the failure to instruct the jury to return a
verdict, denying motion for judgment non obstante veredicto, entering
judgment for the plaintiff, and the insufficiency of the evidence to jus-
tify the verdict as the alleged lack of evidence is the foundation for all

of them. There was sufficient evidence to take the case to the jury, the jury has spoken, and we see no good reason for setting aside the verdict. The judgment is affirmed.

BURKE, Ch. J., and NUESSLE, BIRDZELL, and CHRISTIANSON, JJ., concur.